**Janice PARKER, Plaintiff,**

v.

**VULCAN MATERIAL COMPANY LONG TERM DISABILITY PLAN, et al., Defendants.**

**Case No. EDCV 07–01512 SGL(OPx).**

United States District Court, C.D. California.

Sept. 29, 2009.

Charles J. Fleishman, Fleishman Law Firm, Northridge, CA, for Plaintiff.

Edith S. Shea, Melissa M. Cowan, Burke Williams and Sorensen, Los Angeles, CA, for Defendants.

## ORDER AFTER BENCH TRIAL

STEPHEN G. LARSON, District Judge.

This action came on regularly for bench trial before the Honorable Stephen G. Larson on May 19, 2009, with Paul Fleishman and Charles J. Fleishman on behalf of Plaintiff Janice Parker ("Parker" or "Plaintiff") and Edith S. Shea on behalf of Defendant Vulcan Materials Company Long Term Disability Plan ("Vulcan" or "Defendant"). Plaintiff brought suit against defendant pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiff, as beneficiary of the relevant long-term disability benefits plan, seeks to recover benefits from July 1, 2006 (the date her long term disability benefits were terminated) to the present. The Court, having heard the evidence, finds the facts and states the conclusions of law as appears below.

## I. FINDINGS OF FACT

### A. Policy Provisions

On January 1, 1997, Continental Casualty Company ("Continental") issued group long term disability insurance policy number SR 83096484 ("the Policy"). Administrative Record ("AR") 477–515, 712–729 to benefit the employees of the former defendant Vulcan Materials Company, including plaintiff. The Hartford Life, Inc., and Hartford Life and Accident Insurance Company ("Hartford") later acquired the Policy and made the final decision on Plaintiff's claim. *Id.* at 208–213.

The Policy defines total disability:

"Total Disability" means that, during the Elimination Period … the Insured Employee, because of Injury or Sickness, is:

(1) continuously unable to preform the substantial and material duties of the Insured Employee's regular occupation;

(2) under the regular care of a licensed physician other than the Insured Employee; and

(3) not gainfully employed in any occupation for which the insured Employee is or becomes qualified by education, training or experience.

*Id.* at 502.

The Policy has a mental or emotional disorder exclusion and does not cover any loss caused or resulting from a "[d]isability beyond 24 months after the Elimination Period if it is due to mental or emotional disorders of any type." *Id.* at 503. The Policy, however, will not apply the mental or emotional disorder exclusion to a number of conditions, including dementia if it is a result of stroke, trauma, viral infection, Alzheimer's disease, or other conditions not listed which are not usually treated by a mental health provider or other qualified provider using psychotherapy, psychotrop-

ic drugs, or other similar methods of treatment. *Id.*

The Policy provides that, should a beneficiary become disabled within the meaning of the Policy, he or she would receive monthly benefits after the expiration of a 180 day elimination period. *Id.* at 502, 639.

## B. Plaintiff's Employment and Short Term Disability Claim

Plaintiff worked at Vulcan beginning in March, 2002, as a Real Property Records Manager/Legal Secretary. *Id.* at 1142, 1148.

Plaintiff began seeing psychiatrist Dr. Leslie Brothers on September 27, 2001, for anxiety and depression. *Id.* at 1142, 1145. In August of 2003, Plaintiff applied for and began receiving short term disability benefits and cut her work hours to 20–26 hours per week. *Id.* at 1122, 1145. Plaintiff received $633.92 in California state disability benefits, and $744.53 through Vulcan's short term disability policy. *Id.* at 1144.

## C. Plaintiff's Long Term Disability Claim

Plaintiffs condition worsened and on May 3, 2004, Plaintiff filed a long term disability claim with Vulcan. *Id.* at 1142. As her primary treating physician, Dr. Brothers cited anxiety and depression as the primary diagnosis on Plaintiff's long term disability claim form.

On May 7, 2004, Vulcan submitted Plaintiff's claim for long term disability benefits to Hartford for approval. *Id.* at 1141. Upon receipt of the claim, Hartford requested a functional assessment from Dr. Brothers to evaluate Plaintiff's long term disability claim. *Id.* at 1124. Dr. Brothers submitted the following functional assessment to Hartford on May 24, 2004, along with her office notes and records:

1. The patient is limited in all functions due to low energy and difficulty concentrating.

2. I expect further reduction in work hours will soon be necessary.

3. After some months of rest and full-time attention to her physical health needs, she may be able to return to 40 hours/week employment in fall, 2004.

4. Ms. Parker is not able to perform any tasks full time.

*Id.* at 1124–1133.

## D. Hartford Investigates Long Term Disability Claim

On June 8, 2004, Hartford telephoned Plaintiff to review her claim for long term disability benefits. *Id.* at 582. On the call, Plaintiff explained that she had anxiety, depression, insomnia, and could not concentrate. *Id.* at 583. When asked the cause of the anxiety problem, Plaintiff responded that it was "family stuff," relationships, her physical health, various nutritional deficiencies, hypothyroid, possible adrenal problem, and mercury poisoning. *Id.* at 583–584. Plaintiff said that she was currently worried, stressed about things, and had difficulty making decisions. *Id.* at 584. Plaintiff said that her goals for treatment were to work on anxiety reduction, coping skills and communicating with others. *Id.* at 586. Before ending the conversation, Plaintiff listed her daily medications: Remeron (3.75 mg), Buspar (60 mg), Neurontin (1600 mg), Xanax (0.5 mg), Acifex for acid reflux, Compazine for nausea, Protoniz for gastric distress, and various supplements for digestion, pain and brain. *Id.* at 586–587.

During this time, Plaintiff also saw two other doctors: Plaintiff sought treatment with psychologist, Dr. Connie Call; and later on August 9, 2004, Plaintiff treated

with another psychologist, Dr. Nadine Winocur. *Id.* at 1120, 1091.

Dr. Call prepared a treatment summary which reviewed Plaintiff's history of medical conditions beginning in 2002. *Id.* at 1120–1123. The following summary reflects that history as set forth by Dr. Call: Around March 2002, Plaintiff sustained an ankle injury which did not heal well, requiring the use of a single crutch. *Id.* at 1120. This caused frustration leading to further stress and exhaustion which exacerbated Plaintiff's anxiety and depression, for which she was prescribed Xanax to help maintain emotional stability, allowing her to continue working 40 hours a week. *Id.* at 1120. In August of 2002, Plaintiff experienced myofascial pain and digestive difficulties due to a ill-fitting TMJ (temporomandibular joint) bit guard, which required her to puree all her food. *Id.* at 1120. This condition isolated her at lunch from her co-workers, deepening her depression and creating greater anxiety. *Id.* at 1121. Soon thereafter Plaintiff experienced diarrhea, abdominal pain and excessive hunger due to the digestive problems. *Id.* at 1121. Toward the latter half of 2003, Plaintiff described difficulty focusing on the job, anxiety related to physical pain, and concern over her work related errors (and resultant unsatisfactory work reviews). *Id.* at 1121. Dr. Call recommended adequate time away from work to focus on Plaintiffs medication management, self regulation through exercise and relaxation techniques, a more engaged social life, and continued psychotherapy to help her return to normal functioning. *Id.* at 1123.

Dr. Winocur also prepared a treatment summary which noted that Plaintiffs case "is complex due to interwoven emotional and physical health issues. Her emotional disturbance is also aggravated by the stress of financial problems and highly conflictual family relationships." *Id.* at 1090. Dr. Winocur described Plaintiffs symptoms as including moderate to severe levels of anxiety and depression, negative self-image, and significant emotional distress secondary to physical health problems. *Id.* Dr. Winocur's therapy with Plaintiff "involved overcoming traumatic life experiences and establishing affect management skills through corrective emotional experiences." *Id.* at 1091. Dr. Winocur anticipated that it might be close to two years before Plaintiff could return to work. *Id.* at 1091.

### E. Hartford's Claim Decision

On July 22, 2004, Hartford mailed Plaintiff an approval letter for long term disability benefits and emphasized several key points:

- Hartford reiterated the Policy's definition of "Total Disability." *Id.* at 639.
- Plaintiff's long term disability benefits were approved for her mental nervous conditions of "Generalized Anxiety Disorder and recurrent Depression." *Id.*
- Hartford determined that the period from August 12, 2003 through February 7, 2004, satisfied the Policy's 180 day elimination period. *Id.*
- The Policy would "not cover any loss caused by or resulting from disability beyond 24 months after the elimination period if it is due to mental or emotional disorders of any type." *Id.*

### F. Hartford's Continuing Review

On November 8, 2004, Hartford requested an updated functional assessment and notes from Dr. Brothers regarding Plaintiff's continued psychiatric treatment and progress from August 2004 to the then-present date. *Id.* at 1093. Dr. Brothers responded that Plaintiff still had difficulty concentrating, especially for long periods of time, and continued to have excessive

fatigue which prevented sustained work effort. *Id.* Dr. Brothers noted that she had tried to reduce the dose of Plaintiff's anti-anxiety medication, but could not do so without worsening her symptoms. *Id.* Dr. Brothers also indicated that Plaintiff might be able to return to work around May 1, 2005. *Id.*

Later, around June of 2005, Hartford again requested a further functional assessment and notes from both Plaintiff and Dr. Brothers, so that it could continue to assess her condition. *Id.* at 1079. Plaintiff wrote that there had been no improvement in her condition since the beginning of her disability and that, "I continue to see a psychotherapist and pursue physical health issues." *Id.* at 1078. Dr. Brothers' diagnosis of "recurrent depression" was unchanged, noting symptoms of difficulty concentrating, excessive fatigue, pain, and anxious demeanor upon examination. *Id.* at 1079. Dr. Brothers' prognosis was that Plaintiff was totally disabled, and could not perform any duties requiring mental focus or sustained efforts. *Id.*

### G. Plaintiff Supplements the Record and Makes a Physical Condition Disability Claim

On January 3, 2006, Plaintiff mailed a package to Hartford enclosing additional medical records from several of her doctors: Drs. Steven Harris, Ilona Abraham, Hans Gruenn, Cynthia Watson, Karl Epstein, Suzanne McCormick, Luis Albert; Martha Hierro, Rudolph Bedford, and Bernard Geller. *Id.* at 831.

In response, Hartford wrote Plaintiff a letter on January 8, 2006, reiterating that her long term disability benefits were approved based on a mental or emotional disorder and that it would not cover her loss beyond 24 months, or past February 7, 2006, for that condition. *Id.* at 608. Hartford also acknowledged that on December 2, 2005, Plaintiff notified Hartford

by telephone, that she had disabling physical conditions and would submit information in support of them. *Id.* Hartford requested that Plaintiff submit the supporting information identified in her January 3, 2006 letter within 30 days. *Id.* Hartford cautioned that if it was not received timely, Hartford would make a determination based on the medical information currently on file, which might result in the denial or termination of her long term disability benefits. *Id.*

On January 31, 2006, Plaintiff mailed additional records to Hartford from Dr. Steven Harris, Dr. Martha Hierro, and Dr. Hans Gruenn in support of her physical disability claim. *Id.* at 803. Plaintiff mailed more records to Hartford March 24, 2006, from Dr. Harris and Dr. Abraham in support of her physical condition disability claim. *Id.* at 788.

Among these records was a letter written by Plaintiffs physician, Dr. Harris, dated January 16, 2006, stating that he had diagnosed Plaintiff with Lyme disease and co-infections, and that it was very important that Plaintiff remain free from additional stress. *Id.* at 807. Dr. Harris said that Plaintiff also was unable to return to work at that time because she was "completely disabled." *Id.*

### H. Hartford Responds to Plaintiff's Physical Condition Disability Claim

On April 17, 2006, Hartford wrote Plaintiff a letter addressing her request for consideration to extend long term disability benefits for her physical conditions beyond February 8, 2006. *id.* at 606. After again reminding Plaintiff of the time limitations for mental or emotional disabilities, Hartford set forth the Policy definition of Total Disability as it relates to physical conditions:

Disability means that during the Elimination Period and the following 24

months, Injury or Sickness causes physical or mental impairment to such a degree of severity that You are:

1) continuously unable to perform the Material and Substantial Duties of Your Regular Occupation; and

2) not Gainfully Employed.

After the LTD Monthly Benefit has been payable for 24 months, Disability means that Injury or Sickness causes physical or mental impairment to such a degree of severity that You are:

1) continuously unable to engage in any occupation for which You are or become qualified by education, training or experience; and

2) not Gainfully Employed.

*Id.* at 606–607.

Hartford went on to note that because Plaintiff had been receiving benefits for 24 months, plaintiff must meet the second portion of the above-quoted definition to be eligible for benefits after February 8, 2006. Toward that end, Hartford indicated that it would review Plaintiff's additional medical documentation to determine whether her physical conditions resulted in physical disability, making her eligible for benefits beyond the initial 24 month period. *Id.* at 607 (emphasis added). Lastly, Hartford affirmed that it would continue to make payment on her claim, without prejudice and without acceptance of liability. *Id.*

## I. Dr. Steven Harris and Lyme Disease Diagnosis

Dr. Harris's treatment of Plaintiff for Lyme disease is documented by a series of office visit notes, *Id.* at 268–294, 807–861. Dr. Harris is an active member of the International Lyme & Associated Diseases Society (ILADS) and acts as a clinical consultant for IGeneX, Inc., a laboratory specializing in Lyme disease and co-infections. *Id.* at 348. Dr. Harris has seen over 1,000 patients with tick-born illnesses

in private practice and has attended more than 25 conferences over the years specifically dealing with Lyme and co-infections. *Id.* Dr. Harris currently maintains a practice of over 700 patients with Lyme disease. *Id.*

On February 19, 2005, Plaintiff first sought treatment with Dr. Harris for possible Lyme disease. *Id.* at 282. Dr. Harris noted that Plaintiff had lived in Vermont prior to moving to California and had gone back to visit the last time in 1991, where she had frequently walked through tall grass. *Id.* Although Plaintiff had no recollection of a tick bite after her last trip to Vermont, she said that soon thereafter, she began to develop symptoms of fatigue, ovarian cyst, menstrual irregularity, and TMJ problems, *Id.* Dr. Harris noted that Plaintiff "had a Western blot test, which was negative, ELISA for Lyme, which was positive, and, a Bowen test, which was positive." *Id.* at 282. Dr. Harris also noted that Plaintiff had been camping regularly in Sequoia and Yosemite. *Id.* Dr. Harris assessed that Plaintiff had probable Lyme disease. *Id.* at 283. Dr. Harris recommended a treatment plan of "Samento, Lyme Western blot, Babesia serology, HME, HGE, Bartonella serology, Juice Plus, and antibiotics, pending results of lab tests." *Id.* at 283. After receiving Plaintiff's further lab results, Dr. Harris noted on April 21, 2005:

> She was positive on the IgM and IgG Western blot for Lyme. She was also positive on the IgM for HME and positive on the IgG for HGE. Bartonella was negative, Babesia microti IgM was 1:20. The patient is considering starting treatments. She has also been diagnosed with aflatoxin due to yeast or mold; considering treatment for that, was given a prescription for Diflucan.

*Id.* at 277.

Dr. Harris recommended the antibiotic doxycycline 400 mg a day or Doryx if

Plaintiff was unable to tolerate it. *Id.* Plaintiff continued to see Dr. Harris throughout 2005 up to November 2006 for similar ongoing treatment for Lyme disease and co-infections, *Id.* at 268–294, 807–861.

## J. Dr. Gunnar Heuser and Toxic Encephalopathy Diagnosis

Plaintiff began treatment with Dr. Gunnar Heuser on April 20, 2006. *Id.* at 402. Dr. Heuser attended the University of Cologne Medical School, received a Ph.D. from the University of Montreal in Experimental Medicine and Surgery, and received a diploma from McGill University for internal medicine. *Id.* at 178. Dr. Heuser specializes in neurotoxicology and immunotoxicology. *Id.* at 402.

Dr. Heuser physically examined Plaintiff and prepared a report reviewing Plaintiff's self-described multi-symptom complaints and her history of Lyme disease and exposure to mold. *Id.* Dr. Heuser's report also explained the results of new tests he conducted, and provided a diagnosis on her current condition. *Id.* at 402–405. Dr. Heuser performed the following tests:

- SPECT functional brain scan test was abnormal and compatible with neurotoxic exposure. *Id.* at 403.
- TOVA test was abnormal and showed problems with attention—such a problem is frequently found after neurotoxic exposure which can result in an acquired ADD syndrome. *Id.*
- Pulmonary function test showed obstruction at a baseline reading, which improved after administration of a bronchodilator. *Id.*
- A neurologically oriented physical exam showed a fine bilateral postural tremor. The finger to nose test was somewhat unsteady on the right. *Id.* Balance could not be tested because she walks using one crutch.
- A physical examination showing some expiratory wheezing shortly after the pulmonary function test and administration of the bronchodilator. She developed a significant cough with the pulmonary function test indicating an asthma like condition, but also sensitivity to inhaled chemicals from bronchodilator. *Id.* at 403.

On the basis of the tests, Dr. Heuser diagnosed Plaintiff with toxic encephalopathy, chemically induced asthma, chronic pain syndrome, intolerance to small amounts of chemicals, and Lyme disease by history. *Id.* at 404. According to Dr. Heuser, both Lyme disease and exposure to neurotoxins (including mold toxins) can lead to chronic conditions and multisymptom complaints. Plaintiff's multisymptom complaints were entirely compatible with her history of neurotoxic exposure and in his opinion have led to total disability. *Id.* Dr. Heuser stated that emotional impairment was known to occur in conjunction with Lyme disease as well as with mold toxicity. *Id.* Dr. Heuser believed that it was "evident that her depression was secondary to the primary diagnoses of Lyme disease and toxic encephalopathy." *Id.* Dr. Heuser believed that the objective evidence of impaired brain function was disabling to Plaintiff, for which there is no cure available. *Id.* In conclusion, Dr. Heuser plainly stated that Plaintiff has "physical problems." *Id.*

## K. Plaintiff Demands Status Update and Payment From Hartford

On April 10, 2006, Plaintiff wrote Hartford a letter requesting an immediate response regarding the status of her claim. *Id.* at 785. Plaintiff said that she had not been paid her monthly benefit since February 7, 2006, and was informed on March 9, 2006, that it would take another 8–10 days to finish reviewing her claim. *Id.*

On April 24, 2006, Hartford responded to Plaintiff in a letter explaining that the supplementary medical information she had sent to them on or around February 3, 2006, was received but had not been logged into the claims system in a timely manner. Thus, on February 27, 2006, when Plaintiff called, there was no record of receipt of it. *Id.* at 771. Hartford acknowledged that Plaintiff's call to Hartford on February 27, 2006, was not returned and apologized. *Id.*

### L. Hartford Requests Additional Information

On April 7, 2006, Hartford determined that additional information was needed concerning Plaintiffs ability to perform activities of daily living prior to referral for medical review. *Id.* at 771. As such, Hartford agreed to issue benefits payment on April 10, 2006, for the period from February 8, 2006, through March 31, 2006, in the amount of $3,638.98. *Id.* at 771. Hartford asked Plaintiff to fill out a Claimant Questionnaire regarding her daily living activities and for a newly-executed Medical Release, so that Plaintiff's file could be reviewed by Hartford's Peer Physician. *Id.* at 772. Hartford advised Plaintiff that the Medical Release would allow them to speak directly to her physicians to discuss her current care and treatment related to the physical disability claim. *Id.* at 772.

Plaintiff completed the Claimant Questionnaire on May 6, 2006, indicating that her symptoms had gotten worse. *Id.* at 762. Plaintiff noted that she could perform some activities such as such as bathing, dressing, and using the toilet. *Id.* However, when her symptoms were severe, Plaintiff sometimes could not bathe, dress or perform personal hygiene on her own. *Id.* Furthermore, Plaintiff stated that her prior social and physical activities were limited or eliminated altogether. *Id.*

### M. Hartford's Peer Review by Dr. Keith A. Lammers

Hartford contacted Dr. Keith A. Lammers through Medical Advisory Group, LLC to review Plaintiff's records from July 2003 through January 2006 to make a determination of her functional abilities related to her physical disability claim. *Id.* at 738. Dr. Lammers is a graduate of the University of Colorado Medical School and is a board certified family practitioner. *Id.* at 1151.

Dr. Lammers reviewed Plaintiff's treatment with Dr. Cynthia Watson (specialty unknown) for otitis and low amino acids. *Id.* at 738. In multiple visits with Dr. Watson, Plaintiff complained of persistent gastrointestinal reflux. *Id.* at 738–739. A pathology report requested by Dr. Watson on March 4, 2004, showed that Plaintiff was negative for celiac disease, parasites, inflammation, and malignancy. *Id.* at 739. Further labs from April 22, 2004, showed normal CBC, normal sed rate, and positive ANA (antinuclear antibody) but at low titer, and a positive Lyme antibody test. *Id.* However, further Lyme testing revealed "one band to be positive and per the lab notes, two or more bands were needed to verify Lyme disease or a history of past exposure." *Id.* Dr. Watson made the diagnosis of depression and anxiety and various amino acids were prescribed. *Id.* Another lab report from January 5, 2005, revealed red blood cell inclusions suggestive of a ring form of Babesia. *Id.*

Dr. Lammers reviewed Plaintiff's treatment summary with psychologist Dr. Connie Call dated June 22, 2004, where Dr. Call, "noted a history of worsening anxiety and depression with multiple medical complaints which led to social isolation and frequent work absenteeism ... Plaintiff's medical symptoms continued to worsen as well as problems with concentration and ability to function. Dr. Call stated that

stresses of work made all of her symptoms worse requiring more medications with related side effects." *Id.* at 739.

Dr. Lammers reviewed Plaintiff's treatment summary with psychologist Dr. Nadine Winocur dated November 16, 2004, who noted a diagnosis of anxiety and depression and significant stressors at work with an inability to concentrate, decreased attention, and poor memory. *Id.* at 740. Dr. Lammers commended that the legibility of the records was very poor, however, there was frequent mention of fungal toxic encephalopathy and Lyme disease, however, no exam was noted and treatment for it was unknown. Dr. Lammers stated that "these medical records were not beneficial to the discussion at hand." *Id.* at 740.

Dr. Lammers reviewed Plaintiff's treatment with Dr. Abraham Ilona (unknown specialty), who ran labs showing slightly low white blood count on May 3, 2005, elevated antibodies to molds and fungi of unknown clinical significance on June 14, 2005 and December 19, 2005. *Id.* Labs from August 13, 2005, revealed negative testing for celiac disease and no evidence of diabetes. *Id.* Labs from January 7, 2006, showed normal thyroid function and normal endocrine testing. *Id.*

Lastly, Dr. Lammers reviewed Plaintiff's treatment with Dr. Steven Harris, who evaluated her for Lyme disease on February 19, 2005. *Id.* Dr. Harris' exam revealed lymphadenopathy of unknown degree, a gait that was antalgic due to weakness, and muscle spasms were also noted. Dr. Harris also ran a "Western Blot test that was positive and by CBC criteria would suggest past history of Lyme disease. The lab also showed negative testing for Babesiosis and a positive test for Ehrlichiosis, which indicated a past infection." *Id.*

Dr. Lammers reviewed Plaintiff's treatment with Dr. Harris on April, 21, 2005, July 28, 2005, August 26, 2005, November 4, 2005, and January 6, 2006. *Id.* at 740–741. On June 12, 2006, Dr. Lammers spoke with Dr. Harris on the telephone, wherein Dr. Harris stated that "he felt strongly that Ms. Parker has chronic Lyme disease with co-infections ... He stated that no further testing had been done as he does not believe MRIs, CAT scans, and EMG testings are ways to validate the diagnosis of chronic Lyme disease and that his diagnosis and treatment are based on patient symptomatology and blood tests." *Id.* at 741. During the conversation, Dr. Harris admitted there was a debate about the validity of the diagnosis of chronic Lyme disease, but stated that he did not believe Plaintiffs symptoms were psychosomatic in origin and that Plaintiff had problems tolerating more aggressive treatment options due to subjective intolerance and that Plaintiff used alternative medicine as an adjunct to her treatment. *Id.* at 741.

Dr. Lammers asserted in his medical report that Plaintiff's treatment with prolonged antibiotic therapy should have eradicated any acute infection. *Id.* Dr. Lammers suspected that Plaintiff's condition had fallen into the category of chronic Lyme disease, the diagnosis of which is debated among specialists as to its authenticity. *Id.* at 741–742.

Dr. Lammers further noted that Dr. Harris is not an infectious disease specialist, but nevertheless has a large patient following [for Lyme disease], "as he confirms the diagnosis and its unverified treatment modalities." *Id.* at 741–742.

Based only on the subjective symptomatology and lack of objective findings on exam or lab test, Dr. Lammers found no restriction or limitation in regard to Plaintiff's functional abilities. *Id.* at 742. "The exams that were provided in office encounters reveal no objective loss of function or disability." *Id.* "There has been no objec-

tive documentation of any disease process in regard to EMG testing, imaging such as MRI or CAT scan, further lab work, or specialist consultation. I feel the appropriateness of the claimant's diagnostic workup, diagnosis and treatment has been inadequate and certainly unsubstantiated." *Id.* Accordingly, Dr. Lammers concluded with a high degree of medical certainty that Plaintiff was not restricted from performing full time work and that there was no medically supported restrictions of limitation. *Id.*

## N. Hartford's Claim Decision

On June 21, 2006, Hartford terminated Plaintiff's long term disability benefits effective July 1, 2006, concluding that the primary disabling condition was mental or emotional in nature and therefore subject to the 24 month limitation. *Id.* at 86–88. Hartford based its decision to terminate Plaintiffs claim on policy language and review of medical information from Dr. Harris, Dr. Watson, Dr. Call, Dr. Winocur, Dr. Brothers, Dr. Ilona, Dr. Geller, Dr. Hierro, Dr. Bedford, Dr. Albert, Dr. Epstein and Dr. Gruenn, all of which was reviewed by Dr. Lammers. *Id.* at 87.

Hartford considered Plaintiff's position as a property/legal records administrator and determined that the occupation was primarily a seated office type position requiring negligible physical exertion. *Id.* Although Hartford acknowledged that Plaintiff had been treated for the physical conditions of Lyme disease, allergies, gastrointestinal distress and pain of the jaw, ankle, neck and back, it stated that none of these conditions had been documented to have produced functional limitations that would prevent Plaintiff from engaging in all work activities, particularly on a continuous basis. *Id.* at 88.

With respect to Plaintiff's most recent medical records, Hartford's position was that Plaintiff's long-term antibiotic treatment with Dr. Harris should have eradicated any underlying infectious disease process and that, in any event. *Id.* at 88.

In addition, Hartford maintained that because Plaintiffs medical file did not include any recent diagnostic studies such as MRIs, CT scans or EMG tests, physical diseases could not be identified or ruled out. *Id.* at 88. As a result, in Hartford's view, the majority of the information available supported the conclusion that Plaintiffs disabling condition was anxiety and depression, of a psychiatric nature, and subject to 24 month limitation. *Id.* at 88.

Therefore, Hartford concluded, Plaintiff's medical records did not prove that Plaintiff's condition was a totally disabling physical condition, as defined by the Policy language, and therefore, Plaintiff was no longer entitled to benefits. *Id.* at 88. Hartford advised Plaintiff of her right to appeal the decision in writing within 180 days from receipt of the letter. *Id.*

## O. Plaintiff Appeals the Claim Decision

On July 31, 2006, Plaintiff sent a letter of intent to appeal to Hartford through Disability Claim Consultant and its representative Linda Nee. *Id.* at 78. On December 16, 2006, Plaintiff filed her appeal. *Id.* at 334.

## P. Hartford's Appeals Review by Dr. Daniel P. McQuillen

Upon Plaintiffs appeal, Hartford contacted Dr. Daniel P. McQuillen through University Disability Consortium, to perform an infectious disease medical record review of Plaintiff's appeal. *Id.* at 296–304. Dr. McQuillen is a graduate of the Wisconsin Medical College and is a board certified infectious disease specialist and internal medicine doctor. *Id.* at 1154. Dr. McQuillen has years of clinical experience in infectious diseases, and has received

awards in infectious disease research. *Id.* at 1154–1155. Dr. McQuillen did not personally examine Plaintiff; rather, he reviewed records from Dr. Nona Abraham, Dr. Gunnar Heuser,[1] Dr. Stephen Harris, and Dr. Leslie Brothers and was asked by Hartford to answer specific referral questions related to Plaintiff's physical condition. *Id.* at 296–97. The specific referral questions Dr. McQuillen was asked to address in his review were:

- Please define the claimant's functional/cognitive limitations as of June 12, 2004 and beyond due to Lyme disease, Ehrlichiosis, Babesia, Toxic Mold Encephalopathy, and heavy metal sensitivity. *Id.* at 296.
- Are the claimant's pain, fatigue, and cognitive complaints consistent with the objective medical records? *Id.*
- Does the record document any limitations due to medication? *Id.*

With respect to the first specific referral question, Dr. McQuillen said that there was no clinical syndrome compatible with Ehrlichiosis or Babesiosis as described and the only positive tests were serologies which were only borderline positive. *Id.* at 302. Dr. McQuillen explained that a four-fold increase in convalescent over acute antibody titer was required to make a serologic diagnosis in Ehrlichiosis or Babesiosis. *Id.*

Dr. McQuillen was critical of the interpretation of the "abnormal TOVA test" as evidence of toxic encephalopathy, because there was no objective evidence of a cognitive disorder severe enough to impair Plaintiff's daily functioning. *Id.* Dr. McQuillen also questioned the discrepancy between by Dr. Harris' notes on one occasion stating that Plaintiff was physically capable of conducting ADLs (activities of daily living) independently, yet on another occasion, Dr. Harris noted that Plaintiff was unable to conduct any activity lasting more than 10 minutes. *Id.*

Dr. McQuillen further noted that there was no objective corroboration in the records reviewed for claimant's subjective self-reports of fatigue and cognitive difficulty. *Id.* at 301.

With regard to Plaintiff's Lyme disease diagnosis by Dr. Harris, Dr. McQuillen provided interpretation of the March 1, 2005 labs: "IGeneX Lyme Western blot—IgM—read as positive, but medium-high binding to only 1 CDC band; IgG—read as positive, but medium-high binding to only 2 CDC bands." *Id.* at 298. "In a case such as the claimant, virtually 100% of patients with Lyme disease untreated for multiple years prior to diagnosis will have a fully positive Lyme IgG Western blot, not an isolated positive IgG blot (that is more likely to be affected by false positive binding)." *Id.* at 302.

Dr. McQuillen noted that although Plaintiff lived in Vermont, an area endemic for Lyme disease, she did not have any history of tick bite. *Id.* at 302. Dr. McQuillen referred the CDC's published criteria for a diagnosis of Lyme disease requiring either the presence of erythema migrans (EM) rash or at least one late manifestation *that is laboratory confirmed.*" *Id.* at 302 (emphasis in original). Dr. McQuillen explained that in most patients:

[T]he EM rash was accompanied by fatigue, fever, headache, mild stiff neck, arthralgias or myalgia. Late manifestations included: recurrent brief attacks of objective joint swelling in one or a few joints sometimes followed by chronic ar-

---

1. Throughout the Dr. McQuillen's report, he mistakenly refers to Dr. Gunnar Heuser as Dr. Hans Gruenn.

thritis in one or a few joints ... In the nervous system, lymphocytic meningitis; cranial neuritis, particularly facial palsy; radiculoneuropathy; or encephalomyelitis were considered diagnostic. Encephalomyelitis had to be confirmed by demonstration of antibody production against *Burrelia burgdorferi* in the CSF, evidence by a higher titer of antibody in the CSF than in serum. Headache, fatigue, paresthesia, or mildly stiff neck alone were not criteria for neurologic involvement. Cardiovascular criteria: acute onset of high-grade atrioventricular conduction defects that resolved in days to weeks and were sometimes accompanied by myocarditis. *Id.* at 302–303.

Dr. McQuillen concluded that "the medical records are devoid of a clinical syndrome compatible with primary Lyme disease and the claimant's symptom complex is too nonspecific to fit the above diagnostic criteria." *Id.* at 303. Dr. McQuillen further cautioned that the CDC and FDA have become aware of commercial laboratories that conduct testing for Lyme disease or "**interpret Western blots using criteria that have not been validated and published in peer-reviewed scientific literature.**" *Id.* at 303 (emphasis in original).

Dr. McQuillen was also skeptical about Plaintiff's diagnosis of mold toxicity even though Dr. Nona Abraham's interpretation of the elevated antibody levels reflected in the lab test reports stated "high levels of IgG, IgM, and IgA antibodies against mold and mycotoxins antibodies are not an indication of any disease," yet, Plaintiff was told she suffered from mold toxicity when there was no corroborating evidence for such a diagnosis even by her own treating physician, Dr. Abraham. *Id.*

Dr. McQuillen summarized that Plaintiff's "records document a long-standing history of recurrent major depressive episodes and generalized anxiety disorder requiring treatment with multiple psychoactive medications and long-term psychotherapy." *Id.* He further elaborated that "while there is no evidence in the records that these diagnoses rose to a level that required hospitalization, many of the claimant's subjective complaints could emanate from her psychiatric diagnoses." *Id.*

In concluding his answer to the first specific referral question, Dr. McQuillen stated that as of June 12, 2004 and beyond, "there is no evidence in the objective medical records that the claimant's functional/cognitive limitations would prevent full time work." *Id.* at 304.

With respect to the second specific referral question, Dr. McQuillen answered, "No," Plaintiffs pain, fatigue and cognitive complaints were not consistent with the objective medical records, they in fact "exceed the objective findings in the medical records." *Id.*

With respect to the third and final specific referral question, Dr. McQuillen responded, "No," although the record documented some side effects, such as thrush and nausea secondary to antibiotics, none of the medications created limitations which would rise to a level that would impair functional ability. *Id.*

On February 15, 2007, Dr. McQuillen submitted an addendum to his prior infectious diseases medical record review, which included review of three additional office visits Plaintiff had with Dr. Harris. *Id.* at 234. Dr. McQuillen attempted to reach Dr. Harris, but was unable to do so and thus faxed a series of questions to Dr. Harris regarding Plaintiff's condition. *Id.* at 235. Dr. McQuillen's review of Plaintiff's additional office visits with Dr. Harris did not change the conclusions in his initial record review. *Id.* at 235. Dr. McQuillen expressed that none of the claimant's diag-

noses or subjective self-reports of fatigue and cognitive difficulty would prevent full time work as of June 12, 2004, and beyond. *Id.* at 235.

On February 15, 2007, Dr. Harris prepared responses to Dr. McQuillen's six questions. *Id.* at 166–168. Dr. Harris responded that Plaintiff was completely unable to sustain productive work due to her physical limitations which were consistent with longstanding treatment for Lyme Disease. *Id.* at 167. Dr. Harris emphasized that the primary diagnosis was Lyme disease complicated by toxic encephalopathy and sensitivity to mold, therefore, her inability to sustain work is a physical condition, not a mental or emotional cause. *Id.* at 167.

On February 16, 2007, Dr. McQuillen submitted a second addendum to his prior infectious diseases medical record review, which incorporated and addressed Dr. Harris' responses. *Id.* at 161–164. Dr. McQuillen once more reviewed Plaintiffs two Western blot lab results, the first from April 22, 2004, which was negative with binding only to the 41 kDa band on IgM blot (the most common band subject to nonspecific binding). *Id.* at 163. The second Western blot lab result performed on March 1, 2005 at IGeneX labs was interpreted by Dr. Harris as positive, but when read using the CDC criteria of counting only medium-highly bound bands, the blot is negative (one IgM and two IgG bands bound). *Id.* at 163. Dr. McQuillen reasons that if Plaintiff contracted the bite in Vermont around 1991 (as Dr. Harris postulates, but which is not confirmed by EM rash) and did not receive treatment until 2005, "BOTH Western blots should be FULLY positive by CDC criteria to qualify for an acceptable laboratory diagnosis of Lyme disease." *Id.* at 163 (emphasis in original). Dr. McQuillen, thus, could find no instance in Plaintiff's medical record where the Lyme disease diagnosis was substantiated by CDC criteria. *Id.* at 163. Dr. McQuillen further asserted that there were multiple other potential explanations for the Plaintiff's subjective self-reported symptoms, including her diagnosis for depression, which was initially made in 1996. *Id.* at 163.

With respect to the Toxic Mold Encephalopathy diagnosis, Dr. McQuillen repeated that the lab test report stated, "high levels of IgG, IgM, and IgA antibodies against mold and mycotoxins are not an indication of any disease." *Id.* at 163. Absent further objective demonstration in Plaintiffs record of encephalopathy other than subjective self-reporting, one cannot make the conclusion that Plaintiff suffers from disease related to mold. *Id.* at 163. Again, Dr. McQuillen repeated that none of Plaintiff's diagnoses or subjective self-reports of fatigue and cognitive difficulty would prevent full-time work as of June 12, 2004 and beyond. *Id.* at 164.

## Q. Hartford Denies Parker's Appeal

On February 20, 2007, Hartford sent a letter to Linda Nee of Disability Claims Solutions, who had filed Plaintiff's appeal, notifying her that Plaintiff did not meet the policy definition of disability due to Lyme Disease, Ehrlichiosis, Babesia, Bartonella, Toxic Mold Encephalopathy, and Heavy Metal Sensitivity. *Id.* at 208. Hartford stated that it would uphold its termination of Plaintiff's long term disability benefits based on the evidence contained in Plaintiff's claim file, and listed the various additional information reviewed in its record. *Id.*

Hartford once more highlighted the key Policy provisions applicable to Plaintiffs claims for long term disability benefits and chronologized the events in Plaintiff's file. *Id.* at 209. Hartford reiterated that Plaintiffs claim was approved for benefits effective February 8, 2004, and was limited to a 24 month maximum duration as required

by the policy for disability due to mental disorder. *Id.* at 209. Toward the beginning of 2006, additional medical records were submitted to support a physical disability, however, ultimately Hartford found Plaintiff's claim for further benefits due to physical disability could not be substantiated. *Id.* at 209. The letter explained Hartford's review of Plaintiffs medical records on appeal and found that Plaintiff could not prove eligibility for continued disability due to physical condition. *Id.* at 209–212. Lastly, Hartford's medical review of the evidence found that, physically and cognitively, Plaintiff was not precluded from performing full time work from June 12, 2004 and beyond due to the physical conditions of Lyme disease, Ehrlichiosis, Babesia, Bartonella, Toxic Mold Encephalopathy, and Heavy Metal Sensitivity. *Id.* at 212.

## II. EVIDENTIARY OBJECTIONS

Defendant objects to Plaintiffs Trial Exhibits 1200–1209, on the basis of lack of authentication and inadmissible hearsay. Plaintiff filed no response to Defendant's evidentiary objections, nor was argument regarding their admissibility made at trial. The Court did not rely on the materials to which Defendant objects. Accordingly, the objections are overruled as moot.

## III. EVIDENCE OUTSIDE THE ADMINISTRATIVE RECORD

The Centers for Disease Control (CDC) has extensively studied and tracked Lyme disease, its prevention, transmission, symptoms, diagnosis, treatment, and statistics.[2] Lyme disease is one of the most common tick-born diseases in the United States, which passes to humans by the bite of a black-legged deer tick. The bite infects the human with the bacterium *Borrelia burgdorferi*.[3]

### A. Lyme Disease Symptoms

The symptoms of Lyme disease vary by stages. In the early stages, patients usually develop a circular rash called erythema migrans or EM as a sign of the infection.[4] In the late stages, either months or years later, approximately 60% of patients with untreated infection will begin to have intermittent bouts of arthritis, with severe joint pain and swelling. Large joints are most often affected, particularly the knees. In addition, up to 5% of untreated patients may develop chronic neurological complaints months to years after infection. These include shooting pains, numbness or tingling in the hands or feet, and problems with concentration and short term memory.[5]

### B. Lyme Disease Diagnosis

Lyme disease is diagnosed based on symptoms, objective physical findings (such as erythema migrans, facial palsy, or arthritis), and a history of possible exposure to infected ticks. Validated laboratory tests can be very helpful but are not generally recommended when a patient has erythema migrans (early stages of Lyme disease).[6]

2. Centers for Disease Control, United States Public Health Service ("CDC"), Division of Vector–Borne Infectious Diseases ("DVBID") Lyme, "Learn about Lyme Disease," http://www.cdc.gov/ncidod/dvbid/lyme/index.htm.

3. CDC, National Institute for Occupational Safety and Heath, "Lyme Disease," http://www.cdc.gov/niosh/topics/lyme/.

4. CDC, DVBID Lyme, "Lyme Disease Symptoms," http://www.cdc.gov/ncidod/dvbid/lyme/ld_humandisease_symptoms.htm.

5. *Id.*

6. CDC, DVBID Lyme, "Lyme Disease Diagnosis," http://www.cdc.gov/ncidod/dvbid/lyme/ld_humandisease_diagnosis.htm.

*Laboratory Testing*

Several forms of laboratory testing for Lyme disease are available which measure antibodies made in response to the infection. These tests may be falsely negative in patients with early disease, but they are quite reliable for diagnosing later stages of disease.[7] The CDC recommends a two-step process when testing blood for evidence of Lyme disease. Both steps can be done using the same blood sample.

1) The first step uses an ELISA or IFA test. These tests are designed to be very "sensitive," meaning that almost everyone with Lyme disease, and some people who don't have Lyme disease, will test positive. If the ELISA or IFA is negative, it is highly unlikely that the person has Lyme disease, and no further testing is recommended. If the ELISA or IFA is positive or indeterminate (sometimes called "equivocal"), a second step should be performed to confirm the results.[8]

2) The second step uses a Western blot test. Used appropriately, this test is designed to be "specific," meaning that it will usually be positive only if a person has been truly infected. If the Western blot is negative, it suggests that the first test was a false positive, which can occur for several reasons. Sometimes two types of Western blot are performed, "IgM" and "IgG." Patients who are positive by IgM but not IgG should have the test repeated a few weeks later if they remain ill. If they are still positive only by IgM and have been ill longer than one month, this is likely a false positive.[9]

## C. Lyme Disease Treatment

Most patients can be cured with a few weeks of antibiotics taken by mouth. Antibiotics commonly used for oral treatment include doxycycline, amoxicillin, or cefuroxime axetil. Patients with certain neurological or cardiac forms of illness may require intravenous treatment with drugs such as ceftriaxone or penicillin.[10] Patients treated with antibiotics in the early stages of the infection usually recover rapidly and completely. A few patients, particularly those diagnosed with later stages of disease, may have persistent or recurrent symptoms. The authors of studies sponsored by the National Institutes of Health have concluded that these patients may benefit from a second 4–week course of therapy and that longer courses of antibiotic treatment are not beneficial. Longer courses of antibiotics have been linked to serious complications, including death.[11]

## D. "Chronic Lyme Disease"

The term "chronic Lyme disease" (CLD) is very confusing, as it has been used to describe people with different illnesses. While the term is sometimes used to describe illness in patients with Lyme disease, in many occasions it has been used to describe symptoms in individuals who have no evidence of a current or past infection with *B. burgdorferi*. (*Infect Dis Clin N Am* 2008; 22:341–60). In other cases, "CLD" is used in patients who have non-specific symptoms (like fatigue and pain) after treatment for Lyme disease, but who have no evidence of active infection with *B. burgdorferi*. Physicians sometimes describe these patients as having post-Lyme disease syndrome (PLDS). Because of the

---

7. *Id.*

8. *Id.*

9. *Id.*

10. CDC, DVBID Lyme, "Lyme Disease Treatment and Prognosis," http://www.cdc.gov/ncidod/dvbid/lyme/ld_humandisease_treatment.htm.

11. *Id.*

confusion in how the term CLD is employed, experts in this field do not support its use (*New Eng. J. Med.* 2008; 357:1422–30).[12]

## IV. STANDARD OF REVIEW

■ In reviewing a plan administrator's decision to deny ERISA benefits, the Supreme Court in *Firestone Tire and Rubber Co. v. Bruch,* held that the default standard of review is de novo. *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80(1989). If the plan at issue, however, contractually "confers discretion on the administrator 'to determine eligibility for benefits or to construe the term of the plan' ... then the standard of review shifts to abuse of discretion." *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 965 (9th Cir.2006) (quoting *Firestone,* 489 U.S. at 115, 109 S.Ct. 948).

In relevant part, the Policy provides:

Any denial of a claim for benefits will be provided by the insurance company and consist of a written explanation which will include (i) the specific reasons for the denial, (ii) reference to the pertinent plan provisions upon which the denial is based, (iii) a description of any additional information you might be required to provide and an explanation of why it is needed, and (iv) an explanation of the Plan's claim review procedure. You, ... or a duly authorized representative may appeal any denial of a claim for benefits by filing a written request for a full and fair review to the insurance company ... The full and fair review will be held and a decision rendered by the insurance company no longer than 60 days

after the receipt of the request for review.

AR 726.

Thus, the Court finds that the benefit plan does in fact, confer discretion on Hartford to determine eligibility for benefits under the Policy. Hartford therefore, operates under a structural conflict of interest in its review of Plaintiff's claim, which requires the Court to apply an abuse of discretion standard of review.

## V. CONCLUSIONS OF LAW

### A. Hartford's Conflict of Interest

■ Recently, the Supreme Court revisited its holding in *Firestone* in the case of *Metropolitan Life Insurance Co. v. Glenn,* —— U.S. ——, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). In *Glenn,* the Court reaffirmed that courts should be "guided by principles of trust law" when determining the appropriate standard of review. *Id.* at 2347. When a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion. *Id.* at 2348. The conflict of interest should be given more weight or importance where "circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Id.* at 2351. The weight of the conflict of interest should be given less importance where "the administrator has taken active steps to reduce potential bias and to promote accuracy...." *Id.*

This approach has been described by the Ninth Circuit as an "informed variation on the abuse of discretion standard" that "requires [courts] to discount the amount of

**12.** National Institute of Allergy and Infectious Diseases, "What is chronic Lyme disease?" http://www3.niaid.nih.gov/topics/lymeDisease/understanding/chronic.htm# .

deference given to the administrator's decision to the extent that decision appears to have been influenced by any conflicts of interest." *Sznewajs v. United States Bancorp Amended and Restated Supplemental Benefits Plan,* 572 F.3d 727, 733 (9th Cir. 2009).

■ Where an insurer acts as both the plan administrator and the funding source for benefits, it operates under a structural conflict of interest. *Abatie* at 965 (citing *Tremain v. Bell Indus., Inc.,* 196 F.3d 970, 976 (9th Cir.1999)).[13] The *Abatie* court noted that the "level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example by any evidence of malice, of self-dealing, or of a parsimonious claims granting history." *Id.* at 968. On the other hand, however, a court may weigh a conflict more heavily if (1) the administrator provides inconsistent reasons for denial, (2) fails adequately to investigate a claim or asks the plaintiff for necessary evidence, (3) fails to credit a claimant's reliable evidence, (4) has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly, (5) or by making decisions against the weight of evidence in the record. *Id.*

In determining "the nature, extent, and effect on the decision-making process of any conflict of interest" the Ninth Circuit has further decided that a "district court may in its discretion, consider evidence outside the administrative record." *Id.* at 970. "[T]he decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." *Id.* The situation at hand where

Hartford both administers and funds the claim, creates a conflict prompting some degree of skepticism in reviewing Hartford's determination to deny benefits to Plaintiff. Without evidence of self-dealing, malice or parsimonious claims granting history by Hartford, the Court will apply a low degree of skepticism in its abuse of discretion analysis. Plaintiff, however, makes a number of arguments why the court should elevate its level of skepticism.

**1. Malice**

■ Plaintiff argues that certain mistakes made by Hartford during the claims process tends to show that Hartford acted with malice. Specifically, Hartford misplaced medical records which Plaintiff had mailed to Hartford on February 3, 2006, and failed to log them into the system creating a 8–10 day delay in the claims review process. AR 771. However, the records were later found and made part of the record. *Id.*

Also, there was an occasion when Plaintiff's telephone call was not returned; however, Defendant eventually addressed Plaintiff's concerns by letter. *Id.* at 785.

Lastly and most significantly, Hartford delayed payment on Plaintiff's monthly benefits while awaiting supplemental records. Although Hartford notified Plaintiff that she would continue to receive benefits while her claim was being reviewed they did not. In a letter dated April 10, 2006, Plaintiff complained that she had not been paid her monthly benefit since February 7, 2006. *Id.* However, two weeks after Plaintiff's letter, on April 24, 2006, Hartford agreed to issue benefits payment to Plain-

---

**13.** The *Abatie* decision pre-dates *Glenn.* However, in a post-*Glenn* decision, the Ninth Circuit has noted that *Abatie* and *Glenn* are consistent as to the governing standard of review. *See Page v. Life Ins. Co. of North* *America,* 305 Fed.Appx. 318, 319 (9th Cir. 2008) (noting that *Abatie* "anticipated [*Glenn*] as to the conflict-of-interest analysis").

tiff for the period from February 8, 2006 through March 31, 2006. *Id.* at 771.

Although these were clearly missteps made by Hartford, the Court cannot discern any intent to harm or injure Plaintiff; rather, it appears to the Court that Hartford merely made mistakes in their consideration of Plaintiffs claim. Therefore, the Court does not find that Hartford acted with malice.

## 2. Self–Dealing and Bias

■ Plaintiff asserts that there is evidence of self-dealing and bias by Hartford in its selection of physicians to review Plaintiff's claim and appeal and that the Court should alter its standard of review accordingly.

First, Plaintiff takes issue with Hartford for selecting a doctor who belongs to a group whom Plaintiff alleges has an incentive to submit favorable reports to them. Pl.'s Trial Br. at 14. Specifically, Plaintiff takes issue with Hartford's hiring of Dr. McQuillen through University Disability Consortium (UDC) to review Plaintiff's appeal. In *Caplan v. CNA Financial Corporation,* UDC was found to receive nearly seventy-five percent of its revenue from Hartford. Pl.'s Trial Br. at 16 (citing *Caplan v. CNA Financial Corporation,* 544 F.Supp.2d 984, 989–990 (N.D.Cal.2008)). The *Caplan* court found:

> In addition, Hartford's structural conflict of interest is accompanied by its reliance on UDC, a company which Hartford knows benefits financially from doing repeat business with it, collecting more than thirteen million dollars from Hartford since 2002. It follows that Hartford knows that UDC has an incentive to provide it with reports that will increase the chances that Hartford will return to UDC in the future—in other words, reports upon which Hartford may rely in justifying its decision to deny benefits to a Plan participant.

> UDC's marketing material also suggests that it offers insurers and plan administrators services that will support a parsimonious approach to administering claims.

*Id.* at 991–992.

Plaintiff argues that as an associate of UDC, Dr. McQuillen had a financial incentive to make a finding of "not disabled," despite the evidence presented by Plaintiff. In turn, UDC would continue to receive the bulk of its business from Hartford, and Dr. McQuillen would continue to review medical records for UDC. Pl.'s Trial Br. at 17. Dr. McQuillen's report to Hartford concluded that Plaintiff was not physically impaired and that "none of the Plaintiff's diagnoses or subjective self-reports of fatigue and cognitive difficulty would prevent full-time work as of June 12, 2004 and beyond." AR 164. Plaintiff argues that Dr. McQuillen made this determination despite the followup responses by Plaintiff's treating physician, Dr. Harris, who was adamant that Plaintiff was completely unable to sustain productive work due to her physical limitations which were consistent with long-standing treatment for Lyme disease. *Id.* 167. Even after reading Dr. Harris' answers to the questions posed to him, Dr. McQuillen still could find no instance in Plaintiff's medical record where the Lyme disease diagnosis was substantiated by CDC criteria and believed there were multiple other potential explanations for the Plaintiff's subjective self-reported symptoms, including her diagnosis for depression. *Id.* at 163. Plaintiff argues that Dr. McQuillen never intended to seriously consider Dr. Harris' responses to his questions in the first place, that they were asked merely to "make it look as though he did a thorough review of Ms. Parker's medical history when in fact he did not. By sending questions to Harris he could claim to have considered the answers when

in fact he knew that they would not alter his opinion." Pl.'s Trial Br. at 19.

The record is not exactly as Plaintiff portrays. Dr. McQuillen's initial report shows that he placed phone calls and left messages for Dr. Harris on three occasions, yet none of his calls were returned. AR 301. Following these failed attempts, Dr. McQuillen then asked Hartford if he should try an alternative way of reaching Dr. Harris to get his questions answered, hence, the six questions were faxed to Dr. Harris on February 6, 2007, to which no response had yet been made when Dr. McQuillen prepared the first addendum on February 15, 2007. AR 234–235. On the same day, Dr. Harris faxed his responses to Dr. McQuillen; Dr. Harris restated his opinion that Plaintiff was completely unable to work due to her physical limitations. AR 161–162. Defendant argues that it was not because of bias that Dr. McQuillen concluded that Plaintiff did not suffer from Lyme disease, but rather because Dr. McQuillen and Dr. Harris had a "fundamental disagreement" regarding the interpretation of Plaintiff's Western Blot lab results. Def.'s Resp. Trial Br. at 10–11. For that reason, Dr. McQuillen found in his second addendum that Plaintiff would not be prevented from full time work. AR 164.

Plaintiff also points out that Plaintiff's toxic mold encephalopathy diagnosis by Dr. Gunnar Heuser was also discounted by Dr. McQuillen. Plaintiff asserts that the SPECT scan and TOVA tests were objective diagnostic tests showing that Plaintiff was exposed to neurotoxic agents causing cognitive disabilities. Pl.'s Trial Br. at 17. According to Dr. Heuser's report, both Lyme disease and exposure to neurotoxins (including mold toxins) could lead to chronic conditions and multisymptom complaints. In his opinion, they led to Plaintiff's total disability. AR 404. Still, however, Dr. McQuillen felt that ab-

sent further objective demonstration in Plaintiffs record of encephalopathy other than subjective self-reporting, one could not make the conclusion that Plaintiff suffered from disease related to mold. *Id.* at 163.

Second, Plaintiff asserts that Hartford hired doctors who were biased against Plaintiff's treating physicians' diagnoses. In particular, Plaintiff takes issue with the report by Dr. Lammers who complained that the records kept by Plaintiff's physicians were of "poor documentation and legibility" yet he still managed to decide "with a high degree of medical certainty" that Plaintiff was not restricted from performing full-time work. Pl.'s Trial Br. at 14–15. Most significantly, Plaintiff accuses Hartford of hiring a doctor who doesn't even believe in the disease in question, namely chronic Lyme disease. Plaintiff asserts that Dr. Lammers did not believe Plaintiff was disabled because he himself did not believe in a diagnosis of chronic Lyme disease and because her restrictions were based on subjective symptomatology. Pl's Trial Br. at 15.

Dr. Lammers' report showed that he discussed the Lyme diagnosis with Dr. Harris, and that Dr. Harris admitted there was debate about the validity of the diagnosis of chronic Lyme disease. AR 741. Dr. Lammers further wrote in his report that "the diagnosis of chronic Lyme disease is debated among specialists as to its authenticity. There are many medical specialists who do not feel there is such a disease entity." *Id.* Plaintiff's assertion is inaccurate because Dr. Lammers never stated that he, himself, did not believe in chronic Lyme disease, only that it was debated amongst specialists and concluded that Dr. Harris's diagnoses of plaintiffs chronic Lyme disease was "questionable." Dr. Lammers noted that Dr. Harris is not an infectious disease specialist, however,

even without that qualification, he has developed a large following of patients because he "confirms diagnosis and unverified treatment modalities." AR 742. Dr. Lammers concluded that Plaintiffs diagnostic workup, diagnosis and treatment were inadequate and unsubstantiated because there was no objective documentation of any disease process in regard to EMG testing, imaging such as MRI or CAT scan, further lab work, or specialist consultation. *Id.* Dr. Lammers did not say that Plaintiff did not suffer from chronic Lyme disease, but found that Plaintiff was not restricted from performing full-time work and in his opinion, there was no medically supported restrictions or limitations to Plaintiffs ability to work. *Id.*

Hartford counters the accusations of bias by suggesting that Plaintiffs treating physician, Dr. Harris, is similarly biased in returning a diagnosis for chronic Lyme disease. Def.'s Resp. Trial Br. at 9. In diagnosing Plaintiff with chronic Lyme disease, Dr. Harris is able to maintain a steady income from patients who, like Ms. Parker, come for long-term treatment over a period of years. In fact, Dr. Harris' practice is so busy that he must regularly travel to his office in Malibu, CA from his main office in Nevada City, CA. *Id.* Moreover, Hartford accuses Dr. Harris of having a financial arrangement with the Lyme disease lab to which he sent Plaintiff. *Id.* Dr. Harris acts as a "clinical consultant for IGeneX, Inc.," a laboratory specializing in Lyme disease and co-infections. AR 348. This fact when taken in light of Dr. McQuillen's warning that, the CDC and FDA have become aware of commercial laboratories that conduct testing for Lyme disease or "**interpret Western blots using criteria that have not been validated and published in peer-reviewed scientific literature,**" would lead one to believe that there could be some bias in the reading of lab results by IGeneX and its consultants, if those criteria have not undergone the scrutiny of peers in the scientific field. *Id.* at 303 (emphasis in original). Defendant asserts that Dr. Harris' championing of an expansive view of the criteria for Lyme disease diagnoses serves his financial interests. Def.'s Trial Br. at 10. To the extent that financial interests are considered in weighing an expert medical opinion, Defendant argues that they should be considered with respect to all of the physicians, not just Hartford's. Def.'s Resp. Trial Br. at 10.

Additionally, the Supreme Court has noted that while physicians retained by the administrator "may have an 'incentive' to make a finding of 'not disabled,' so [too does] a treating physician, in a close case, may favor a finding of 'disabled.'" *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Therefore, although Hartford's reliance on its own physician over Plaintiff's treating physicians will trigger some heightened skepticism in light of Hartford's structural conflict of interest, it is of a limited nature.

### 3. Parsimonious Claims–Granting History

Plaintiff has not produced evidence that Hartford has a "parsimonious claims-granting history" warranting skepticism in the Court's review.

### 4. Inconsistent Reasons for Denial

Likewise, there is no evidence that Defendant provided inconsistent reasons for denying Plaintiff's claim. Hartford asserts that it was consistent in its position that Plaintiff suffered from a mental or emotional disorder, up until the time Plaintiff notified Hartford that she also suffered from a physical condition disability, which was twenty-two months after having received benefits based on her emotional or mental condition. Def.'s Resp. Trial Br. at

5. Thereafter, Hartford reviewed Plaintiff's claim for total disability based on physical condition beyond the twenty-four month maximum payable period, by requesting peer review from two independent physicians, including one board-certified infectious disease specialist. Def.'s Resp. Trial Br. at 5. Although early on, Plaintiffs psychologist noted some of her physical problems, such as TMJ, sprained ankle, and gastrointestinal distress, Hartford never received a report which indicated that those medical issues were disabling. Rather, Dr. Brothers, plaintiff's psychiatrist and primary treating physician while she was still working at Vulcan, consistently wrote on Plaintiffs short term and long term disability claim forms, that Plaintiff was diagnosed with anxiety and depression. AR 1124,1142. Defendant argues that its later review of Plaintiffs physical condition disability claim in 2006 was decided and reviewed independently of Plaintiffs mental or emotional condition disability previously claimed.

Both of Hartford's physicians reviewed Plaintiff's medical records specifically to answer Hartford's inquiries. Dr. Lammers was asked to make a determination of Plaintiff's "functional abilities related to her physical disability claim." *Id.* at 738. Dr. McQuillen was asked "1) to define Plaintiffs functional and cognitive limitations from June 12, 2004 and beyond due to Lyme disease, Ehrlichiosis, Babesia, Toxic Mold Encephalopathy, and heavy metal sensitivity; 2) are the claimant's pain, fatigue, and cognitive complaints consisted with the objective medical records?; and 3) does the record document any limitation due to medication?" *Id.* at 296–97. Hartford never asked Dr. Lammers or Dr. McQuillen to make a mental or emotional determination; rather, they were directed to review Plaintiff's functional limitations which directly related to her ability to perform her job at Vulcan as a records manager and legal secretary. Both Dr.

Lammers and Dr. McQuillen concluded that Plaintiff's physical condition did not prohibit her from working full-time. *Id.* at 738–742; 310–318. Accordingly, Hartford explained in its termination letter that the reason for its denial was because Plaintiff did not meet the policy definition of disability due to Lyme disease, Ehrlichiosis, Babesia, Toxic Mold Encephalopathy, and heavy metal sensitivity. *Id.* at 208. Thus, there is no evidence that Hartford provided inconsistent reasons for denial.

### 5. Failure to Adequately Investigate Claim

Plaintiff also did not produce evidence that Defendant failed to adequately investigate the claim. Hartford hired two independent qualified physicians to review Plaintiff's claim, Dr. Lammers and Dr. McQuillen. Dr. McQuillen is the only board certified infectious disease specialist out of all the physicians and is the most qualified to make a determination whether Plaintiff actually suffered from Lyme disease and co-infections. Plaintiff's diagnosis for chronic Lyme disease and co-infections rests primarily on the diagnosis by Dr. Harris, who is a family practitioner with experience in Lyme, however, Defendant argues that as a "board certified infections diseases expert, Dr. McQuillen has undergone specific training regarding infectious diseases and has met standards regarding the diagnosis and treatment of infectious diseases (such as Lyme disease) that Dr. Harris (as a family practitioner) has not met. Def.'s Resp. Trial Br. at 9. Plaintiff presents no evidence that Hartford failed to adequately investigate Plaintiff's claim warranting skepticism in the Court's review.

### 6. Failure to Credit Reliable Evidence

Plaintiff asserts that Hartford's doctors failed to credit the reliable evidence sub-

mitted by her treating physicians and that Hartford's doctors should have relied on her treating physician's reports and conclusions over its own. Plaintiff argues that pursuant to *Regula v. Delta Family–Care,* Hartford was bound to apply the "treating physician rule" which gives greater weight to the claimant's doctors, who actually examined and treated Plaintiff. *Regula v. Delta Family–Care,* 266 F.3d 1130 (9th Cir.2001). The Supreme Court, however, overruled *Regula* in *Black & Decker Disability Plan v. Nord,* holding that ERISA plan administrators are not required to accord special deference to the opinions of treating physicians. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003).

Plaintiff argues that Hartford should have relied on the opinions of Plaintiff's treating physicians because, unlike Hartford's doctors, her treating physicians had the opportunity to examine and treat her over an extended period of time. Pl.'s Reply Br. at 11. Moreover, Plaintiff notes that although Dr. McQuillen is a board-certified infectious disease expert, his CV shows no specific experience with Lyme disease or other tick borne illnesses. Dr. Lammers, who's a family practitioner, also has no specific Lyme experience. In fact, the only physician who has specific Lyme experience is Dr. Harris, the one who made Plaintiffs Lyme disease diagnosis. Pl.'s Reply Br. at 7–8. Plaintiff further mentions that Dr. Harris has been involved with several research projects regarding Lyme disease, including one related to the Western Blot and "antibody band specificity to *Borrelia burgdorferi* ss antigens in CDC characterized samples;" he has worked for IGeneX, Inc., as a clinical consultant for this highly specialized Lyme disease reference laboratory; he has worked at the nation's only non-profit Lyme and other tick-borne disease clinic, and he has received a training grant from the International Lyme and Associated Diseases Society to work with D. Charles Ray Jones in the field of pediatric Lyme disease. Pl.'s Reply Br. at 8; AR 176–177.

Plaintiff's argument fails because Dr. Harris' diagnosis is not supported by acceptable medical standards, specifically those of the CDC and FDA. Def.'s Trial Br. at 15. Hartford suggests that Dr. Harris' opinion should be given far less weight in light of his failure to follow accepted medical protocols. The primary disagreement between the Dr. Harris and Dr. McQuillen stem from the interpretation of Plaintiff's lab results. Def.'s Resp. Trial Br. at 11. Dr. McQuillen's initial infectious disease medical records review states:

> Laboratory confirmation of a clinical syndrome compatible with Lyme disease must also fit diagnostic criteria. In a case such as the claimant, virtually 100% of patients with Lyme disease untreated for multiple years prior to diagnosis will have a fully positive Lyme IgG Western blot, not an isolated positive IgM blot (that is more likely to be affected by false positive binding).

AR 303.

Dr. McQuillen emphasized that specifically, the "isolated positive IgM blot" indicated that Plaintiff did not have Lyme disease. Def.'s Trial Br. at 11. If Plaintiff did have Lyme disease, she would have a "fully positive Lyme IgG Western blot." *Id.* In addition, Dr. McQuillen mentioned that there was no history of tick bite or an erythema migrans (EM) rash or a laboratory confirmed late manifestation which would be consistent with a Lyme disease diagnosis, thus he concluded that the medical records were devoid of a clinical syndrome compatible with primary Lyme disease and that Plaintiffs symptom complex was too nonspecific to fit the diagnostic criteria. AR 302.

Again, Dr. McQuillen specifically reiterated in his second addendum to his report that according to acceptable criteria, Plaintiff's lab results do not support a finding of Lyme disease as diagnosed by Plaintiff's treating physician:

> Similarly, the laboratory diagnosis of Lyme disease does not meet established and widely accepted diagnostic criteria. The first Western blot found in the records (4/22/04) is negative with binding only to the 41kDa band on IgM blot (the most common band subject to nonspecific binding). The next blot, done at IGeneX labs on 3/1/05, is interpreted as positive, but when one only counts medium-highly bound bands **the blot is negative by CDC criteria** (one IgM and 2 IgG bands bound).... **BOTH Western blots should be FULLY positive by CDC criteria to qualify for an acceptable laboratory diagnosis of Lyme disease.**

AR 163 (emphasis added).

*Black & Decker* provides that plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker* at 834, 123 S.Ct. 1965. However, the court distinguished between refusing to credit reliable evidence, and offering other reliable evidence that conflicts with the claimant's evidence. *Id.* With respect to the latter, *Black & Decker* said that there is no special burden of explanation that attaches when reliable conflicting evidence is submitted. *Id.* Hartford argues that it is not arbitrarily refusing to credit Dr. Harris' report, but rather is offering more reliable evidence, the expertise of Dr. McQuillen, who follows widely acceptable medical standards of review and diagnosis, in finding that Plaintiff did not suffer from Lyme disease.

The Court is satisfied that Hartford did not merely disregard Dr. Harris' report, but that Hartford hired Dr. McQuillen, a competent and qualified physician to thoroughly examine Plaintiff's medical file, and that he has simply disagreed with the results offered by Dr. Harris. Hartford has addressed the opinions offered by Dr. Harris, and has not simply disregarded it or dismissed them off hand. Therefore, Plaintiff presents no evidence that Hartford failed to credit Plaintiffs evidence which would warrant heightened skepticism.

For the above reasons, the Court finds that although discretionary review is warranted here, several factors weigh in favor of some heightened skepticism because of Hartford's conflict of interest.

### B. Ambiguous Mental Disorder Provision

Plaintiff argues that this Court should apply the doctrine of contra proferentem, as against the drafter in favor of the Plaintiff, when a plan provision is capable of more than one interpretation. *Lang v. Long–Term Disability Plan,* 125 F.3d 794 (9th Cir.1997). Pl.'s Trial Br. at 20.

Assuming Plaintiff is correct that the Policy definition of total disability is ambiguous as to the definition of disability due to "mental or emotional disorders of any type," that ambiguity had no impact on the claim at issue here. Plaintiff, recognizing that the period during which she could collect benefits for disability due to "mental or emotional disorders" was coming to an end, submitted evidence regarding a disabling physical condition. Thus, Plaintiff exhausted her benefits under the Policy for mental or emotional disorders, and the claim denial did not implicate the provision Plaintiff contends is ambiguous.

### C. Abuse of Discretion

■ The primary issue before the Court is whether Hartford abused its discretion in deciding that Plaintiff was ineligible for

long term disability benefits, beyond the initial 24 months, because she did not suffer from a physical condition that was totally disabling within the definition of the Policy.

██ Applying traditional abuse of discretion analysis, "[a]n ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan,* 410 F.3d 1173, 1178 (9th Cir.2005). A plan administrator's decision to deny benefits should be upheld " 'if it is based upon a reasonable interpretation of the plan's terms and was made in good faith.' " *Id.* (quoting *Estate of Shockley v. Alyeska Pipeline Serv. Co.,* 130 F.3d 403, 405 (9th Cir.1997)). On the other hand, it should be reversed if a review of "the entire record leads to a 'definite and firm conviction that a mistake has been committed.' " *Id.* at 1179 (quoting *Concrete Pipe & Prods. of Cal. Inc. v. Construction Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 622, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993)). For the reasons set forth herein, the Court factors in some heightened skepticism to this traditional standard.

### 1. Hartford Explained the Reasons for Its Denial

Hartford clearly explained in its February 20, 2007 termination letter, the express reasons why Plaintiff's claim was being denied. AR 208–213. Hartford went into great detail to list all the documents which were reviewed by Hartford in Plaintiff's file. Hartford reiterated the pertinent Policy provisions applicable to Plaintiff's situation, namely the definitions of total "Disability." Hartford also listed the requirements Plaintiff must satisfy to show her proof of loss, among which included:

5) Objective medical findings which support Your Disability. Objective medical findings include but are not limited to tests, procedures, or clinical examination standardly accepted in the practice of medicine, for Your disabling condition(s).

6) The extent of Your Disability, including restrictions and limitations which are preventing You from performing Your Regular Occupation.

AR 209.

Hartford acknowledged the initial 24-month period of benefits was due to generalized anxiety disorder and recurrent depression, which was approved on February 8, 2004, and which fell under the mental or emotional disability exclusion. Hartford noted the dates which Plaintiff submitted additional medical reports to support a physical disability, which were January 3, 2006, February 1, 2006, and March 24, 2006. Hartford explained that it agreed to continue to make payment on Plaintiff's benefits without admission of liability while it conducted a review and investigation of her physical disability claim to determine her eligibility for physical disability benefits. After reviewing her claim, Hartford denied her claim on June 21, 2006 and benefits payment terminated effective July 1, 2006.

Hartford reviewed Plaintiff's contention that its hiring of Dr. Lammers was not the appropriate specialist to render an opinion on Lyme Disease. Hartford noted that Plaintiff's records primarily reflected her physical symptoms, etiology, bacteriology, pain management, and lab reports, but were devoid of any psychiatric treatment notes, labs, or reports.

Hartford's review also included Plaintiff's own personal account: That she believed that she had been disabled since January 2005, since being diagnosed with Lyme disease; that any assertion that her

disability was psychiatric was incorrect; and that she believed she had cognitive limitations due to Toxic Encephalopathy and sensitivity to chemicals, as reported by Dr. Heuser's report on December 5, 2006.

Hartford summarized the review made by its own infectious disease specialist, Dr. McQuillen of UDC, for review of Plaintiff's subjective complaints. Hartford reviewed the findings made by Dr. McQuillen in his infectious disease report, addendum, and second addendum, all of which concluded that none of Plaintiffs subjective self-reports of fatigue and cognitive difficulty would prevent her from full time work as of June 12, 2004 and beyond.

Based on its review, Hartford concluded that physically and cognitively, Plaintiff was not precluded from performing full time work, and thus was not totally disabled within the definition of the Policy, from June 12, 2004 and beyond due to Lyme Disease, Ehrlichiosis, Babesia, Bartonella, Toxic Mold Encephalopathy, and Heavy Metal Sensitivity. Accordingly, Hartford upheld the termination of her claim. *Id.*

In light of the thorough review made by Hartford, Plaintiff does not contend that Hartford rendered a decision without explanation, or that Hartford construed provisions of the plan in a way that conflicted with the plain language of the plan; rather, Plaintiff asserts that Hartford relied on clearly erroneous findings of fact, namely, those made by Hartford's reviewing physicians. *See Boyd* at 1178.

## 2. Hartford Did Not Erroneously Reject the Treating Physicians' Opinions

Plaintiff's primary contention is that Hartford abused its discretion by erroneously rejecting Plaintiff's medical evidence and by relying on its own doctors' opinions over hers. Furthermore, Plaintiff argues that Hartford abused its discretion by failing to have its doctors physically examine Plaintiff. Although the Policy says, "At Our expense, We have the right to have a physician examine Insured Employee as often as reasonably necessary while the claim is pending," never once did Hartford's reviewing physicians seek to examine Plaintiff. Pl.'s Trial Br. at 19; AR 505. Plaintiff argues that every doctor who examined her agreed that she was totally disabled, and that her disability stemmed from a physical cause. Pl.'s Trial Br. at 21. Thus, Plaintiff argues that her physicians, unlike Hartford's, had an opportunity to know and observe her condition, and thus, before denying her claim, Hartford should have performed an independent medical examination of its own. *Id.* Plaintiff relies on *Kalish v. Liberty Mutual/Liberty Life Assur. Co.,* in her assertion that whether a doctor has physically examined the claimant is a factor that the Court should consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician. *Kalish v. Liberty Mutual/Liberty Life Assur. Co.,* 419 F.3d 501 (6th Cir.2005) ("We find that the failure to conduct a physical examination ... may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination."). However, Plaintiff omitted the court's further explanation that, "reliance on a file review does not, standing alone, require the conclusion that [a plan administrator] acted improperly." *Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 295 (6th Cir.2005).

Hartford concedes that although pursuant to the Policy, it could have examined Plaintiff, it did not need to, especially since the dispute primarily revolved around the reading of Plaintiff's lab results from the Western Blot tests. Def.'s Resp. Trial Br. at 11. Rather than physically examine Plaintiff, Hartford chose to engage the only infectious disease specialist involved

in the matter to review her medical record to determine her functional ability to work. Dr. McQuillen has the highest level of understanding and specialized training as to the proper diagnosis and treatment for an infectious disease condition such as Lyme disease and performed a medical file review of Plaintiff's condition and thorough examination of her lab results, not once or twice, but three times. Furthermore, unlike Plaintiffs physician, Dr. McQuillen applied accepted medical standards and guidelines.

Therefore, Hartford did not abuse its discretion in failing to conduct an independent medical examination of Plaintiff.

### 3. A Review of the Medical Evidence Supports a Finding of No Abuse of Discretion

The Court's review of the evidence related to Plaintiff's physical condition leads to the conclusion that Hartford did not abuse its discretion in denying benefits to Plaintiff for a disabling physical condition due to Lyme Disease, the co-infections Ehrlichiosis, Babesia, Bartonella, Toxic Mold Encephalopathy, or Heavy Metal Sensitivity.

#### a. Lyme disease

Plaintiff argues that Hartford erred in relying on its physicians' conclusions that Plaintiff did not suffer from Lyme disease because none of Hartford's doctors have as much experience in Lyme disease as her physician, Dr. Harris does. Pl.'s Reply. Br. at 7. Beginning with Dr. Lammers' review, Plaintiff criticizes Dr. Lammers' qualifications as a family practitioner who has no experience with the disease in question and who Plaintiff asserts does not even believe in the existence of chronic Lyme disease. *Id.* at 8. Plaintiff further points out that Dr. Lammers suggested several diagnostic procedures, including MRIs, CAT scans, and EMG testing, but did not note why those tests would be indicative of a Lyme condition. Dr. Harris responded to Dr. Lammers' inquiry stating that those diagnostic tests were not relevant to the diagnosis of Lyme disease and that Plaintiff's diagnosis was based on her "symptomatology and blood tests." AR 741.

Plaintiff also takes issue with Dr. Lammers' conclusion that "with a high degree of medical certainty that Ms. Parker is not restricted from performing full-time work," and that there was "no medically supported restrictions or limitation." AR 742. Plaintiff argues that Dr. Lammers could not reasonably reach this conclusion about Plaintiff's functional abilities with such a high degree of certainty without actually physically examining her, especially when he complained vociferously that the other physicians' notes, diagnostic work-ups and treatment were inadequate. Pl. Reply Br. at 8–9.

However, Dr. Lammers' conclusion was based on lab tests ordered by Dr. Abraham and Dr. Watson. Although Plaintiffs April 22, 2004 lab test showed a positive Lyme antibody test, Dr. Lammers noted that further Lyme testing revealed one band to be positive and per the lab notes, "two or more bands were needed to verify Lyme disease or a history of past exposure." *Id.* Neither Plaintiff nor any of her physicians have attempted to dispute the accuracy of Dr. Lammers' reading of this particular Lyme antibody test or argue with the lab's note requiring that two or more bands were needed for verification. Thus, the initial positive reading for Lyme disease could not be substantiated.

Dr. Lammers also commented that Plaintiff's treatment with Dr. Harris and the prolonged antibiotic therapy "should have eradicated any acute infection." *Id.* at 741. During a telephone call between the two doctors, Dr. Harris did not attempt to explain why after the prolonged

antibiotic therapy, Plaintiff's condition still had not improved. Dr. Harris simply stated he did not feel Plaintiff's symptoms were psychosomatic in origin, but that she had problems tolerating more aggressive treatment options due to "subjective intolerance." *Id.* On the same telephone call, Dr. Harris admitted there was a debate in the medical community about the validity of the diagnosis of chronic Lyme disease. *Id.* Dr. Lammers further commented that there were many medical specialists who did not feel there was such a disease entity and that Dr. Harris "has developed a large following of patients as he confirms the diagnosis [of chronic Lyme disease] and its unverified treatment modalities." *Id.* at 741–742.

After considering Plaintiff's medical records, and his conversation with Dr. Harris, Dr. Lammers could not find any objective findings on exam or any lab or imaging to substantiate Plaintiff's symptomatology, thus he concluded that Plaintiff had no medically supported restrictions or limitations. *Id.* at 742.

Plaintiff also takes issue with Dr. McQuillen's reports which found no clinical syndrome compatible with primary Lyme disease. *Id.* at 303. Dr. McQuillen reviewed both the first and second set of Lyme disease lab results. With respect to the first and oldest Lyme disease test, Dr. McQuillen wrote that it was negative with binding only to the 41kDa band on IgM blot (the most common band subject to nonspecific binding). *Id.* at 163. This conclusion was also reached by Dr. Lammers and remains unrefuted.

Addressing the second and most recent Lyme disease test, Dr. McQuillen reviewed the lab result from March 1, 2005. In his initial infectious disease medical review, Dr. McQuillen wrote, "IGeneX Lyme Western blot—IgM—read as positive, but medium-high binding to only 1 CDC band; IgG—read as positive, but medium-high

binding to only 2 CDC bands." *Id.* at 298. He analyzed that, "In a case such as the claimant, virtually 100% of patients with Lyme disease untreated for multiple years prior to diagnosis will have a fully positive Lyme IgG Western blot, not an isolated positive IgG blot (that is more likely to be affected by false positive binding)." *Id.* at 302. Again, Dr. McQuillen addressed this same test in the second addendum to his medical report, where he stated that applying the CDC criteria of counting only medium-highly bound bands to the lab result, the blot is negative (one IgM and two IgG bands bound). *Id.* at 163. Dr. McQuillen reasoned that if Plaintiff contracted the bite in Vermont around 1991 (as Dr. Harris had postulated) and did not receive treatment until 2005, "BOTH Western blots should be FULLY positive by CDC criteria to qualify for an acceptable laboratory diagnosis of Lyme disease." *Id.* at 163 (emphasis in original). By CDC criteria, both the IgM and IgG bands must be fully positive, that is, there must be sufficient medium-high binding to each band. Applying the CDC guideline to Plaintiff's lab results, there is insufficient binding. Dr. McQuillen, thus, could find no instance in Plaintiffs medical record where the Lyme disease diagnosis was substantiated by CDC criteria. *Id.* at 163.

Unlike Dr. McQuillen and even Dr. Lammer's review of the Western blot lab results, Dr. Harris' interpretation of the March 1, 2005 Western blot provides no explanation of how his "positive" reading of the lab result was reached. Dr. Harris' diagnosis was extremely brief and lacked analysis of any kind as to how the report was read and what criteria or guidelines were used in its interpretation. Dr. Harris simply wrote in his April 21, 2005 notes that, "Janice comes in for followup. She was positive on the IgM and IgG Western blot for Lyme." AR 835. Without more, the Court cannot gauge what criteria Dr.

Harris used to come to this conclusion. Moreover, it is obvious from the lab report that the March 1, 2005 Western blot test was sent to IGeneX labs, the same laboratory where Dr. Harris is a consultant. AR 841–846. Absent further explanation by Dr. Harris, this connection raises some concern about the accuracy of the reading.

In addition, Dr. McQuillen's analysis that Plaintiff did not suffer from Lyme disease was not only based on a reading of the lab results, but also based on other factors to make the determination that Plaintiff did not have Lyme disease. Specifically, Dr. McQuillen noted that although Plaintiff lived in Vermont, an area endemic for Lyme disease, she did not have any history of tick bite. *Id.* at 302. Dr. McQuillen referred to the CDC's published criteria for a diagnosis of Lyme disease requiring either the presence of erythema migrans (EM) rash or at least one late manifestation *that is laboratory confirmed." Id.* at 302 (emphasis in original). Dr. McQuillen explained that in most patients:

> [T]he EM rash was accompanied by fatigue, fever, headache, mild still neck, arthralgias or myalgia. Late manifestations included: recurrent brief attacks of objective joint swelling in one or a few joints sometimes followed by chronic arthritis in one or a few joints … In the nervous system, lymphocytic meningitis; cranial neuritis, particularly facial palsy; radiculoneuropathy; or encephalomyelitis were considered diagnostic. Encephalomyelitis had to be confirmed by demonstration of antibody production against *Burrelia burgdorferi* in the CSF, evidence by a higher titer of antibody in the CSF than in serum. Headache, fatigue, paresthesia, or mildly stiff neck alone were not criteria for neuro-

logic involvement. Cardiovascular criteria: acute onset of high-grade atrioventricular conduction defects that resolved in days to weeks and were sometimes accompanied by myocarditis.

*Id.* at 302–303.

Thus, Dr. McQuillen concluded that there was no objective corroboration in the record for claimant's subjective self-reports of fatigue and cognitive difficulty. *Id.* at 301. After having reviewed Plaintiff's lab results, her medical file and other facts, and after having prepared a report and two addendums, Dr. McQuillen could find no instance in Plaintiffs medical record where the Lyme disease diagnosis was substantiated by CDC criteria. *Id.* at 163.

The Court is satisfied that there was sufficient evidence on the record to support Hartford's conclusion that Plaintiff did not suffer from Lyme disease. Hartford, therefore, did not abuse its discretion in finding Plaintiff's claim of physical disability arising from Lyme disease unsupportable.

**b. Ehrlichiosis, Babesia & Bartonella**

The co-infections identified by Plaintiff's physician, Dr. Harris, were Erhlichiosis, Babesia and Bartonella. The diagnosis of these infections also arise from Dr. Harris' testing and treatment. Specifically, Dr. Harris' very same office notes which determined that Plaintiff was positive for Lyme disease also gave rise to a diagnosis of these related co-infections. The office note says, "She was also positive on the IgM for HME and positive on the IgG for HGE. Bartonella was negative, Babesia microti IgM was 1:20." [14] AR 835.

Unfortunately, the record is not as fully developed as to these diagnoses as it was for Lyme disease. Dr. Harris never dis-

---

14. HME and HGE stand for human monocytic ehrlichiosis (HME) and human granulocytic ehrlichiosis (HGE).

cussed his conclusions with respect to Erhlichiosis, Babesia or Bartonella further. Both of Hartford's doctors, however, attempted to interpret Dr. Harris' diagnosis. In his medical report and review of Dr. Harris' treatment, Dr. McQuillen said that there was no clinical syndrome compatible with Ehrlichiosis or Babesiosis as described and the only positive tests were serologies which were only "borderline positive." *Id.* at 302. Dr. McQuillen explained that a four-fold increase in convalescent over acute antibody titer was required to make a serologic diagnosis in Ehrlichiosis or Babesiosis. *Id.*

Furthermore, Dr. Lammers also noted that labs showed negative testing for Babesiosis and positive test for Ehrlichiosis, which indicated a past infection. AR 740. With respect to whether Plaintiff at that time suffered a current Ehrlichiosis infection, no comment was made. Lastly, the diagnosis of Bartonella seems to have carried over with no basis whatsoever, as even Dr. Harris noted that, "Bartonella was negative." AR 835.

Based on what currently is in the record, the Court is satisfied that there is a substantial evidentiary basis to support Defendant's conclusion that Plaintiff did not have co-infections of Ehrlichiosis, Babesiosis, or Bartonella, therefore, Hartford did not abuse its discretion.

### c. Toxic Mold Encephalopathy & Heavy Metal Sensitivity

Plaintiff's claim of Toxic Mold Encephalopathy [15] was first diagnosed by Dr. Harris, then supported by Dr. Gunnar Heuser.[16] Pl's Trial Br. at 17. Once more, the very same office notes from Dr. Harris dated April 21, 2005, which determined that Plaintiff was positive for Lyme disease, also found aflatoxin, a carcinogenic substance in Plaintiff's lab results. Dr. Harris' diagnosis read, "She has also been diagnosed with aflatoxin due to yeast or mold; considering treatment for that, was given a prescription for Diflucan." *Id.* at 277. Dr. McQuillen reviewed the actual lab test report and highlights the disclaimer from the lab report which said, "high levels of IgG, IgM, and IgA antibodies against mold and mycotoxins are not an indication of any disease." *Id.* at 163. Thus, Dr. McQuillen concluded that absent further objective demonstration in Plaintiff's record of encephalopathy other than subjective self-reporting, one could not make the conclusion that Plaintiff suffered from disease related to mold. *Id.*

Plaintiff later sought treatment with neurotoxicology and immunotoxicology expert Dr. Heuser, who physically examined Plaintiff and discussed Plaintiffs exposure to mold and the cognitive impairment which followed. AR 402. Dr. Heuser conducted several tests and provided a diagnosis based on her current condition. *Id.* at 402–405.

- SPECT functional brain scan test was abnormal and compatible with neurotoxic exposure. *Id.* at 403.

- TOVA test was abnormal and showed problems with attention—such a problem is frequently found after neurotoxic exposure which can result in an acquired ADD syndrome. *Id.*

- Pulmonary function test showed obstruction at a baseline reading, which improved after administration of a bronchodilator. *Id.*

- A neurologically oriented physical exam showed a fine bilateral postural tremor. The finger to nose test was somewhat unsteady on the right. *Id.*

---

**15.** Encephalopathy as understood here, is a form of brain disease or disorder, specifically attributed in this instance to mold.

**16.** *See* note 3.

Balance could not be tested because she walks using one crutch

- A physical examination showing some expiratory wheezing shortly after the pulmonary function test and administration of the bronchodilator. She developed a significant cough with the pulmonary function test indicating an asthma like condition, but also sensitivity to inhaled chemicals from bronchodilator. *Id.* at 403.

On the basis of the tests, Dr. Heuser diagnosed Plaintiff with toxic encephalopathy, chemically induced asthma, chronic pain syndrome, intolerance to small amounts of chemicals, and Lyme disease by history. *Id.* at 404. Furthermore, Dr. Heuser explained that both Lyme disease and exposure to neurotoxins (including mold toxins) can lead to chronic conditions and multisystem complaints. Dr. Heuser felt that Plaintiff's multisymptom complaints were entirely compatible with her history of neurotoxic exposure, which have led to total disability. *Id.* Dr. Heuser stated that emotional impairment was known to occur in conjunction with Lyme disease as well as with mold toxicity. *Id.* Dr. Heuser believed that it was "evident that her depression was secondary to the primary diagnoses of Lyme disease and toxic encephalopathy." *Id.* Dr. Heuser believed that the objective evidence of impaired brain function was disabling to Plaintiff, for which there was no cure available. *Id.* In conclusion, Dr. Heuser plainly stated that Plaintiff has "physical problems." *Id.*

Dr. McQuillen had an opportunity to review Dr. Heuser's report. Dr. McQuillen was critical of the interpretation of the abnormal TOVA test" performed by Dr. Heuser. Dr. McQuillen pointed out that the TOVA test did not show that there was a physical cause for the diminished attention. Def.'s Trial Br. at 11. Hartford argues that from as far back as May 2004,

Plaintiff's psychiatrist, Dr. Brothers noted that Plaintiff had difficulty concentrating, and that the TOVA proved nothing new. AR 1124. Dr. McQuillen also felt that there was no objective evidence of a cognitive disorder severe enough to impair Plaintiff's daily functioning. *Id.*

Lastly, Plaintiff claims that she suffers from heavy metal sensitivity, however, there is little mention of it in the record. There was only one instance where such a condition was raised, that is during the June 8, 2004, telephone interview between Hartford and Plaintiff to conduct a review her claim for long term disability benefits, Plaintiff mentioned that she had mercury poisoning. *Id.* at 583–584. Aside from this brief mention, the parties make no reference to heavy metal sensitivity in the briefs.

## VI. CONCLUSION

In conclusion, even applying a heightened level of skepticism to Hartford's conflicts of interest, the Court cannot find that Hartford abused its discretion in denying Plaintiff's claim for benefits. Hartford maintains that it did not reject Plaintiff's claim because it fell under the mental exclusion or that she did not experience some physical symptoms, but rather because it disputed whether the affect of Lyme disease and the other co-infections were so severe that they impeded Plaintiffs ability to work. The Court agrees that Plaintiff was unsuccessful in proving that she was so disabled as to the claimed conditions that would render her unable to work. Thus, Hartford did not abuse its discretion in concluding that Plaintiff did not have a disabling physical condition as defined by the Policy.

Within ten days of the entry of this Order, Defendant shall lodge with the

Court and email to the chambers email address, a proposed judgment.